UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:19-CV-614

| | | |
|---|---|---|
| THE NORTH CAROLINA EYE BANK,<br>INC. d/b/a MIRACLES IN SIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| HIGH ENERGY OZONE, LLC, JOHN | ) | |
| C. NEISTER, and S. EDWARD NEISTER, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff The North Carolina Eye Bank, Inc. d/b/a Miracles In Sight ("Plaintiff" or "Miracles In Sight") is a nonprofit entity that was induced by the Defendants to invest $2 million in a start-up technology company called High Energy Ozone, LLC ("HEO3"). Miracles In Sight's investment was based on grand promises about a new technology that the Defendants said could be employed in furtherance of Miracles In Sight's mission to provide the highest quality tissue for use in vision-restoring corneal transplants and other disinfecting applications. Unfortunately for Miracles In Sight and the physicians and patients it serves, the Defendants have repeatedly failed to live up to their obligations, and the promises Miracles In Sight relied upon in deciding to invest its critical funds and non-profit cash reserves in this venture now appear to have been untrue. As set forth more fully below, the Defendants' false promises and other willful misconduct give rise to numerous causes of action that entitle Miracles In Sight to recover substantial damages.

1

## PARTIES

1.      Plaintiff Miracles In Sight is a North Carolina non-profit corporation with its principal office address in Forsyth County, North Carolina at 3900 West Point Blvd., Suite F, Winston-Salem, North Carolina 27103.

2.      Defendant HEO3 is a New Hampshire limited liability company formed on or about March 31, 2016, with its principal office address at 30 Centre Road, Suite 6, Somersworth, New Hampshire 03878.

3.      Defendant S. Edward Neister ("Ed Neister") is a co-founder of HEO3, who has been a manager of that entity at all times relevant to this action, and who is, upon information and belief a citizen and resident of New Hampshire, who resides at 574 Sixth Street, Dover, NH 03820. Ed Neister has at times operated under the name "Pathogen Path Consulting LLC." Upon information and belief, Pathogen Path Consulting LLC is not a viable legal entity but was simply a business name reserved by Ed Neister with the New Hampshire Secretary of State, which business name has expired. For avoidance of doubt, any allegations herein regarding Ed Neister should be deemed to include, without limitation, Ed Neister doing business under the name "Pathogen Path Consulting."

4.      Defendant John C. Neister ("John Neister") is Ed Neister's brother, is also a co-founder of HEO3, and was a manager of that company at all times relevant to this action. Upon information and belief, John Neister is a citizen and resident of Massachusetts, who resides at 41 South Great Road, Lincoln, MA 01773. Ed and John Neister will be referred to collectively herein as "the Neisters."

2

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the matter in controversy exceeds the sum or value of $75,000 and involves claims between citizens of different States.

6.     The Defendants are subject to personal jurisdiction in this State pursuant to Article 6A, Chapter 1, of the General Statutes of North Carolina, including without limitation N.C. Gen. Stat. § 1-75.4, and the Defendants have sufficient minimum contacts with this forum, including but not limited to their contacts with Miracles In Sight, to justify the assertion of personal jurisdiction over them.  For example, and without limitation: (i) the Defendants are engaged in substantial activity within this State, and are subject to the jurisdiction of this Court by reason of their regularly conducted and systematic business contacts in this State; (ii) the Defendants have purposefully availed themselves of the privilege of conducting business within this judicial district; (iii) the Defendants have established sufficient minimum contacts with this judicial district such that they should reasonably and fairly anticipate being haled into court in this judicial district; (iv) the Defendants have purposefully directed activities at residents of this State, including Miracles In Sight; (v) solicitation and/or services activities were carried on within this State by or on behalf of the Defendants at or about the time of the injuries complained of by Miracles In Sight, a North Carolina entity; and (vi) the injuries complained of in this action by Miracles In Sight arise out of acts or omissions within this State by the Defendants, including without limitation promises made to Miracles In Sight by the Defendants to perform services within this State and/or to pay for services to be performed in this State by Miracles in Sight. Among other contacts with North Carolina from which this action arises, the Neisters caused HEO3 to enter into contracts with North Carolina-based Miracles In Sight that govern the

parties' relationship under this action, and under which the parties agreed to "irrevocably and unconditionally submit" to the jurisdiction of the state or federal courts of North Carolina and to waive any challenges to personal jurisdiction or venue.

7.     Venue is proper in this district, where Plaintiff maintains its principal place of business, pursuant to 28 U.S.C. § 1391(b)(2), because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims at issue in this action occurred.

## FACTS

8.     Miracles In Sight is a nonprofit based in Forsyth County that is one of the largest eye banks in the world.  The organization's primary mission is to help restore sight to people around the world, which it does by recovering corneal tissue upon the passing of those who have chosen to be donors and then storing that high-quality corneal tissue until it can be provided to ophthalmologists for use in corneal transplants.  Miracles In Sight is also involved in research and development efforts geared toward improving corneal transplant procedures.

9.     Ed Neister is a physicist, who claims to have discovered a technology that could be used to cure eye infections, among other applications.  The patented technology relates to ultraviolet disinfection devices and is known as the Far-UV Sterilray™ technology (the "Technology").  The Technology can purportedly be used to kill molds, fungus, bacteria, and viruses by direct impact of ultraviolet light.  Upon information and belief, Ed Neister is the owner of the U.S. and foreign patents related to the Technology.

10.     The Neisters formed HEO3 on or about March 31, 2016, for the purpose of commercializing the Technology by manufacturing disinfection devices.

11.     The Neisters were introduced to Miracles In Sight in early 2016, and they approached Miracles In Sight in February of 2016 to discuss a possible investment in an entity called Ocular PhotoDisinfection, LLC ("OPD").  The Neisters described OPD as an entity they planned to use as a vehicle to develop and commercialize opthalmological applications of the Technology.  Miracles In Sight was initially interested in those ophthalmology applications, but it soon became clear that other potential applications of the Technology may have shorter paths to commercialization.  Accordingly, the discussions quickly turned to a possible investment by Miracles In Sight in what the Neisters described as OPD's "parent" entity, HEO3, which the Neisters said would participate in not just OPD's work, but other applications of the Technology as well.  Specifically, the Neisters represented to Miracles In Sight that its investment in HEO3 would fund – and provide Miracles In Sight an interest in – all of the applications of the Technology, including but not limited to OPD's work.

12.     Miracles In Sight was presented by the Defendants with an HEO3 business plan, which touted the potential applications for the Technology in the healthcare sector, among others, and stated that HEO3 was interested in finding a partner "having specialized knowledge of a given sector's disinfection and treatment needs."  The plan also stated that HEO3 was selling disinfection devices under license of the Technology from Ed Neister and included impressive sales and profitability forecasts that the Defendants labeled as "likely conservative." The plan described the intended uses of the solicited investor funds, which the Defendants said were needed to ramp up full production by developing resources and fabricating production equipment to put in place the necessary infrastructure to keep pace with anticipated orders.

13.     Based on the Defendants' representations about the status and prospects for the business, and how the solicited investment funds were to be used, Miracles In Sight agreed to

5

enter into a Unit Purchase Agreement with HEO3 (the "Unit Purchase Agreement") dated June 21, 2016, which John Neister signed as a manager of HEO3. A true and correct copy of the Unit Purchase Agreement is attached hereto as **Exhibit A** and incorporated by reference as if fully set forth herein.

14.     At or around the same time, the Neisters signed written certifications and consents, true and correct copies of which are attached as **Exhibit B** and incorporated by reference as if fully set forth herein, adopting and affirming resolutions that, *inter alia*, approved (i) HEO3 entering into the Unit Purchase Agreement with Miracles In Sight, (ii) the admission of Miracles In Sight as a member of HEO3, and (iii) HEO3 entering into a Patent License Agreement with Ed Neister for a grant of an exclusive license of the patents and patent applications underlying the Technology (the "License Agreement").

15.     As agreed, the License Agreement was entered into effective on or about the same date as the Unit Purchase Agreement. A true and correct copy of the License Agreement is attached hereto as **Exhibit C** and incorporated by reference as if fully set forth herein.

16.     Under the License Agreement, in exchange for the issuance of 6,230,000 units of membership interest in HEO3, Ed Neister purportedly granted HEO3 an "exclusive, worldwide, royalty-free license" to "develop, make, have made, use, import, market, offer for sale and sell" products and services derived from the Technology. In the License Agreement, Ed Neister further represented and warranted that he had "the legal right to grant the license" and that he had "no other outstanding agreements or obligations inconsistent with the terms and provisions of this Agreement."

17.     To induce Miracles In Sight to invest $2 million in HEO3, the Defendants made several material representations and warranties, on which Miracles In Sight actually, reasonably, and justifiably relied to its detriment.

18.     For example, and without limitation, the Defendants represented and warranted that (i) all action on the part of the officers of HEO3 necessary for the execution, delivery, and performance of all of HEO3's obligations under the License Agreement had been taken or would be taken prior to the first investment by Miracles In Sight, and that (ii) the License Agreement, when executed and delivered by HEO3, would constitute a valid, legally binding, and enforceable obligation of HEO3.

19.     The Defendants further represented and warranted that HEO3 "owns or possesses or believes it can acquire on commercially reasonable terms sufficient legal rights to all 'Company Intellectual Property,'" defined as all "intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in to and under any of the foregoing, and any and all such cases that are owned or used by and/or as are necessary to the Company in the conduct of the Company's business as now conducted and as presently proposed to be conducted."

20.     The Defendants further represented and warranted specifically that there were no then-existing license agreements at the time of Miracles In Sight's investment commitment: "Other than with respect to commercially available software products under standard end-user object code license agreements, there are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any

7

kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person."

21. The Defendants further represented and warranted that, other than the agreements attached to the Unit Purchase Agreement, "there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve … (ii) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company, [or] (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products …."

22. The Defendants further represented and warranted that the Company had not "sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business."

23. The Defendants further represented and warranted that, to the Company's knowledge, "none of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement … that would materially interfere with such employee's ability to promote the interest of the Company or that would conflict with the Company's business.  Neither the execution or delivery of [the License Agreement and other related agreements], nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated."

24. The Defendants further agreed to use the funds invested by Miracles In Sight solely for the purposes set forth in the HEO3 business plan that had been presented to Miracles In Sight as an inducement to its investment in the company, including specifically the funding of needed equipment and other manufacturing infrastructure.

25. In the Limited Liability Company Agreement for HEO3 (the "Operating Agreement"), also attached to the Unit Purchase Agreement and entered into between and among the parties effective June 21, 2016, the Defendants further agreed that the managers of the company would operate the business transparently, making available to any requesting member books and records of the company, including "true and full information regarding the state of the business and financial condition of the Company," as well as other information regarding HEO3's affairs. The Defendants further agreed that the managers would "cause books of account to be maintained reflecting the operations of the Company" and that proper financial statements would be furnished to Miracles In Sight on a quarterly and annual basis. A true and correct copy of the Operating Agreement is attached hereto as **Exhibit D** and incorporated by reference as if fully set forth herein.

26. The obligations of Miracles In Sight to purchase membership interest units in HEO3 were expressly made subject to, *inter alia*, the condition that these and other representations and warranties made by Defendants were "true and correct in all respects," and that "the representations and warranties of the Company … contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchaser …."

9

27.     Furthermore, Ed Neister signed a Compliance Certificate, pursuant to the Unit Purchase Agreement, in which he personally certified that (i) "[e]xcept as set forth in or modified by the Disclosure Schedule, the representations and warranties of the Company contained in Section 2 of the Agreement are true and correct in all respects as of the date hereof" and (ii) "[t]he Company has performed and complied with all covenants, agreements, obligations and conditions contained in the Agreement that are required to be performed or complied with by the Company on or before the Closing."  A true and correct copy of the Compliance Certificate is attached hereto as **Exhibit E** and incorporated by reference as if fully set forth herein.

28.     These and other material representations by the Defendants regarding HEO3's rights with respect to the Technology as of June 2016, together with the Defendants' representations about HEO3's sales and profitability, the uses of the funds to be invested, and the financial and operational transparency with which the business was to be operated, were the bases for Miracles In Sight's decision to make a very significant investment in HEO3 in exchange for a 20 percent ownership stake in the company.

29.     Miracles In Sight closed on the first $1 million tranche of its HEO3 investment in or around June of 2016.  Miracles In Sight closed on the second $1 million tranche of its HEO3 investment in or around April of 2017.

30.     In addition to these monetary investments in HEO3, Miracles In Sight invested other time and resources in HEO3's work, acting as a partner in the development of the Technology for possible eye bank applications.  For example, and without limitation, OPD's testing of the Technology on corneal tissue in 2016 was in its very early stages, and Miracles In Sight began participating significantly in that testing, including the provision of valuable corneal tissue for testing, to aid in determining safe parameters for OPD's application of the Technology.

31.     Shortly after Miracles In Sight completed the funding of its $2 million investment in HEO3, however, the Defendants stopped using Miracles In Sight as the sole eye bank for research on OPD's application of the Technology and began working instead with another eye bank in Florida to supply corneal tissue for HEO3's research.

32.     During this time, the Defendants continued to solicit Miracles In Sight to invest substantial funds in OPD, in addition to the $2 million investment in HEO3.

33.     During those discussions, Miracles In Sight was told by the Defendants that OPD would have an exclusive license to develop and sell the Technology for disinfection applications in the ophthalmology sector and would collaborate with HEO3 under a development / supply agreement to develop and commercialize devices for use in disinfecting corneas and eye-related surfaces for transplant, surgery, office treatments, and other ophthalmology applications.  The Defendants never suggested, however, that the OPD license had at that time already been granted, wholly undermining the entire premise for Miracles In Sight's HEO3 investment.

34.     Upon being provided by the Defendants with an OPD business plan that referenced an "exclusive license" from Ed Neister with regard to the Technology, Miracles In Sight demanded to see a copy of the license.  In response, the Defendants provided for the first time in late 2017 a document dated January 21, 2016, under which Ed Neister purportedly granted an exclusive license in the intellectual property rights underlying the Technology to OPD months *before* he granted the same rights to HEO3 in order to induce Miracles In Sight's investment.  That document was never provided or disclosed to Miracles In Sight at any time prior to the funding of both tranches of Miracles In Sight's HEO3 investment.

35.     Miracles In Sight has since discovered that the Defendants were, during the same period of time, holding out OPD as having an exclusive license from Ed Neister with regard to

11

the development and sale of devices using the Technology in the ophthalmology sector. The Defendants also made representations in the marketplace to the effect that Miracles In Sight does not in fact have rights with respect to the use of the Technology in eye disinfection products. These representations created confusion in the marketplace, impaired the value of HEO3, and wholly undermined Miracles In Sight's investment.

36. In addition, since completing its $2 million investment in HEO3, Miracles In Sight has been largely frozen out of the company's operations by the Neisters.

37. Despite the size of Miracles In Sight's investment, it did not control the management and operations of HEO3 at any time. Even following the investments by Miracles In Sight, the Neisters still collectively owned almost 80 percent of HEO3 and maintained total control over operations as majority managers of the company, with John Neister serving as the president and sole officer. Unfortunately for Miracles In Sight, it soon learned that the Neisters' actual management of HEO3 and the Technology was far different than they had promised when they were trying to induce the investment.

38. For example, the Neisters have abused their authority, control, and domination of HEO3 by, *inter alia*, consistently failing and refusing to allow Miracles In Sight access to complete and accurate company books and records, including without limitation financial statements and other information regarding the business and financial condition of the company. When financial information has been provided by the Defendants, that information has often been materially incomplete, and the Defendants have not been responsive to questions from Miracles In Sight regarding how company funds, including the $2 million invested by Miracles In Sight, have been used.

Case 1:19-cv-00614-WO-JLW   Document 1   Filed 06/19/19   Page 12 of 26

39.     Throughout the period of Miracles In Sight's investment in HEO3, the Neisters have repeatedly assured Miracles In Sight that HEO3 is very busy, that business is booming, and that significant sales and profits are on the immediate horizon. The Defendants have consistently failed, however, to provide proper, complete, and accurate financials and other company records requested by Miracles In Sight to substantiate these claims.

40.     In or around of April of 2017, Miracles In Sight and HEO3 entered into a Memorandum of Understanding ("MOU"), under which HEO3 agreed, as a condition to Miracles In Sight closing on the second tranche of its $2 million investment, *inter alia*, to organize the business books per the guidance of the company's CPA; to allow Gay Wilson, Miracles In Sight's Director of Finance & Administration, to act as the company's Chief Financial Officer and to help set up books, reports, and work with HEO3 staff to identify Key Performance Indicators to measure the health of the company; to have no less than monthly conference calls to discuss business; to permit "frequent" physical visits to discuss business and evaluate progress; and to otherwise follow the Operating Agreement. A true and correct copy of the MOU is attached hereto as **Exhibit F** and incorporated by reference as if fully set forth herein. Despite this agreement, however, once the second tranche of the investment was funded by Miracles In Sight, the Defendants refused to honor these and other commitments they made in the MOU, including without limitation by failing to recognize Gay Wilson as the company's CFO.

41.     As of the date of this Complaint, Miracles In Sight has never received a distribution on account of its membership interest in HEO3, and because of the Neisters' control over all aspects of the company's management, Miracles In Sight has little visibility into the company's finances, including how the funds it has invested in HEO3 have been used.

Case 1:19-cv-00614-WO-JLW   Document 1   Filed 06/19/19   Page 13 of 26

42.     Because of the Neisters' continued refusal to provide complete and accurate information to Miracles In Sight about the company's operations and financial standing, Miracles In Sight was forced to engage counsel and its own outside accounting firm and has incurred significant professional fees in an effort to obtain information that should have been completely, timely, and willingly provided by the Neisters at no cost.

43.     As a result, Miracles In Sight has learned of significant irregularities in the management of HEO3's finances by the Neisters including, *inter alia*, substantial loans from HEO3 to the Neisters, unusual and undefined legal expenses,  the payment of an undisclosed "finder's fee" for the Miracles In Sight investment (in violation of the Unit Purchase Agreement), questionable fees and/or payments to the Neisters and/or entities affiliated with them, a previously undisclosed eviction of HEO3 from its leased office space, and numerous examples of irregular or improper accounting practices indicating likely manipulation of the financial statements by the Neisters.

44.     Furthermore, upon information and belief, the funds invested by Miracles In Sight were not used, in whole or in part, for the purposes set forth in the HEO3 business plan presented to Miracles In Sight as an inducement to its investment, as required by the Unit Purchase Agreement, and were instead used by the Neisters for their own purposes, including without limitation for the benefit of other Neister-owned entit(ies), that were not in the best interests of HEO3 and/or Miracles In Sight.

45.     Upon information and belief, the Neisters have acted willfully and intentionally to deprive Miracles In Sight of access to company information in a deliberate attempt to conceal from Miracles In Sight the true financial condition of HEO3.  Upon information and belief, these actions and omissions by the Neisters, in violation of their duties under the Operating Agreement

and applicable law, constitute fraud, gross negligence, and willful misconduct by the Neisters and were not based on a good-faith reasonable determination that the course of conduct was in the best interest of the company. Upon information and belief, the Neisters' conduct has resulted in gaining a financial profit or other advantage for themselves to which they were not entitled.

46.     As these and other actions and omissions by the Defendants have come to light and continue to come to light, Miracles In Sight has made reasonable efforts to resolve its concerns through discussions outside of Court, but no progress has been made, leaving Miracles In Sight no option but to file this action and seek all rights and remedies available to it under the parties' agreements and applicable law.

## CAUSES OF ACTION

### Count One – Fraud / Fraudulent Inducement

47.     The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

48.     The acts of the Defendants as set forth above and as may be proved at trial of this action constitute material misrepresentations.

49.     Upon information and belief, the Defendants made the alleged material misrepresentations with knowledge of their falsity, and with the intention that Miracles In Sight would rely on the false representations by entering into the Unit Purchase Agreement and related agreements and following through with its commitment to invest $2 million in HEO3.

50.     Miracles In Sight did in fact reasonably and justifiably rely on these intentionally false representations, to its detriment, and suffered damages as a direct and proximate result of its reliance on the Defendants' material misrepresentations.

15

51.     The above-described conduct by the Defendants also justifies the imposition of punitive damages under applicable law.

## Count Two – Negligent Misrepresentation

52.     The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

53.     The Defendants supplied information to Miracles In Sight as set forth above and as may be proved at the trial of this action.

54.     The Defendants intended for Miracles In Sight to rely on the information that the Defendants supplied.

55.     The information provided to Miracles In Sight by the Defendants was false.

56.     In the alternative to Count One, the Defendants failed to use reasonable care or competence in obtaining or communicating the information.

57.     Miracles In Sight did in fact reasonably and justifiably rely on the information communicated by the Defendants, to its detriment, and suffered damages as a direct and proximate result of its reliance.

## Count Three – Unfair and Deceptive Trade Practices

58.     The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

59.     The Defendants' actions as set forth above and as may be proved at the trial of this action were, in whole or in part, in and affecting commerce.

16

60.     The Defendants' actions as set forth above and as may be proved at the trial of this action violate Chapter 75 of the North Carolina General Statutes, in whole or in part, as they constitute unfair and deceptive trade practices.

61.     As a direct and proximate result of these unfair, deceptive, and unlawful acts by the Defendants, Miracles In Sight has suffered damages in an amount to be proved at trial.

62.     The Defendants have willfully engaged in the acts or practices alleged herein, and there has to date been an unwarranted refusal by the Defendants to fully resolve the matter which constitutes the basis of this suit.

63.     Pursuant to N.C. Gen. Stat. § 75-1.1, *et seq.*, Miracles In Sight is entitled to recover from the Defendants costs and attorneys' fees in connection with this action, as well as treble damages.

<u>Count Four – Breach of the Unit Purchase Agreement and the MOU</u>

64.     The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

65.     In the alternative to Count One, the Unit Purchase Agreement and the MOU are valid and enforceable contracts.

66.     Miracles In Sight has complied with all of its duties and obligations under the Unit Purchase Agreement and the MOU and has satisfied all conditions precedent to recovering the relief sought in this action.

67.     HEO3 has materially breached its obligations to Miracles In Sight, as set forth herein and as may be shown at trial, including without limitation by materially breaching multiple representations and warranties on which Miracles In Sight relied in entering into the Unit Purchase Agreement and the MOU.

17

68.     Miracles In Sight has suffered and continues to suffer damages, in an amount to be proved at the trial of this action, on account of HEO3's material breaches of the Unit Purchase Agreement and the MOU.

69.     Miracles In Sight is entitled to recover said damages from HEO3, plus interest at the maximum rate allowed by law and attorneys' fees, court costs, and expenses caused by HEO3's defaults.

Count Five – Breach of the HEO3 Operating Agreement

70.     The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

71.     In the alternative to Count One, the HEO3 Operating Agreement is a valid and enforceable contract.

72.     Miracles In Sight has complied with all of its duties and obligations under the HEO3 Operating Agreement and has satisfied all conditions precedent to recovering the relief sought in this action.

73.     The Neisters have materially breached their obligations to Miracles In Sight, as set forth herein and as may be shown at trial, including without limitation by consistently failing and refusing to provide financial and operational information requested by Miracles In Sight and to which Miracles In Sight is entitled as a member.

74.     Miracles In Sight has suffered and continues to suffer damages, in an amount to be proved at the trial of this action, on account of the Neisters' material breaches of the HEO3 Operating Agreement.

75. Miracles In Sight is entitled to recover said damages from the Neisters, plus interest at the maximum rate allowed by law and attorneys' fees, court costs, and expenses caused by the Neisters' defaults.

<u>Count Six – Breach of Implied Duty of Good Faith and Fair Dealing</u>

76. The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

77. HEO3 had an implied duty of good faith and to deal fairly with ADD in the course of performing the Unit Purchase Agreement and the MOU.

78. HEO3 has breached its duty of good faith and fair dealing as set forth herein and as will be shown at trial.

79. The Neisters, as controlling managers of HEO3, had an implied contractual covenant of good faith and fair dealing, including a duty to use reasonable efforts to meet the reasonable expectations of the company and Miracles In Sight as a member of the company on matters within the scope of the Operating Agreement but not specifically addressed in it.

80. The Neisters have breached their duty of good faith and fair dealing as set forth herein and as will be shown at trial.

81. Miracles In Sight has suffered and continues to suffer damages, in an amount to be proved at the trial of this action, as a direct and proximate result of the Defendants' breaches of their implied duties of good faith and fair dealing.

82. Miracles In Sight is entitled to recover said damages from the Defendants, plus interest at the maximum rate allowed by law and attorneys' fees, court costs, and expenses caused by the Defendants' defaults.

<u>Count Seven – Breach of Fiduciary Duties as Managers</u>

19

83.     The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

84.     Under applicable law, the Neisters, as controlling managers of HEO3, have a duty of care to both the company and its individual members, under which they must discharge their management duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances.

85.     Under applicable law, the Neisters, as controlling managers of HEO3, owe a duty of loyalty to the company and its individual members, meaning that they must act in a manner that they reasonably believe to be in the best interest of the company, including without limitation, a duty not to compete against the company, a duty not to engage in self-interested transactions with the company, a duty not to usurp business opportunities of the company, a duty to disclose to the members with reasonable promptness material information of which they become aware concerning the company, a duty to use company property only for the benefit of the company, a duty to avoid improper personal benefits, and a duty to act toward the company with fiduciary good faith.

86.     By their actions and omissions as alleged herein and as may be further shown at the trial of this action, the Neisters failed to act in accordance with contractual good faith and in a manner they reasonably believed to be in the best interest of the company.

87.     By their actions and omissions as alleged herein and as may be further shown at the trial of this action, the Neisters failed to act in fiduciary good faith by avoiding conduct they knew would inflict injury on HEO3 and Miracles In Sight in its capacity as a member of HEO3.

88.     The Neisters' actions and omissions as managers of HEO3, as alleged herein and as may be further shown at the trial of this action, amount to gross negligence and/or willful misconduct.

89.     These breaches of the duties owed by the Neisters to Miracles In Sight have caused Miracles In Sight distinct harm, separate and apart from the company and the other minority members.

90.     Miracles In Sight has been damaged by the Neisters' breaches of their fiduciary duties, as set forth herein and as will be further shown at trial, in an amount to be determined.

91.     The above-described conduct by the Neisters also justifies the imposition of punitive damages under applicable law.

<u>Count Eight – Breach of Fiduciary Duties as Controlling Members</u>

92.     The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

93.     The Neisters were at all relevant times the majority controlling members of HEO3, in which Miracles In Sight was induced to purchase a minority membership interest.

94.     As majority, controlling members of HEO3, the Neisters assumed and owed fiduciary duties to Miracles In Sight as a minority member of that entity.

95.     Through their status as majority, controlling members of HEO3, the Neisters exercised dominion and control over Miracles In Sight.

96.     By the actions alleged herein and as will be further shown at trial, the Neisters have breached the fiduciary duties they owed to Miracles In Sight.

21

97.    The Neisters' actions and omissions as controlling members of HEO3, as alleged herein and as may be further shown at the trial of this action, amount to gross negligence and/or willful misconduct.

98.    These breaches of the duties owed by the Neisters to Miracles In Sight have caused Miracles In Sight distinct harm, separate and apart from the company and the other minority members.

99.    Miracles In Sight has been damaged by the Neisters' breaches of their fiduciary duties, as set forth herein and as will be further shown at trial, in an amount to be determined.

100.    The above-described conduct by the Neisters also justifies the imposition of punitive damages under applicable law.

Count Nine – Constructive Fraud

101.    The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

102.    As is described above, the Neisters had and continue to have fiduciary relationships with Miracles In Sight.

103.    As set forth herein and as will be further shown at trial, the Neisters have failed to act openly, honestly, and fairly in their dealings with Miracles In Sight.

104.    The Neisters have personally benefitted and seek to further personally benefit from these intentional and malicious breaches of their positions of trust and confidence.

105.    Miracles In Sight has been harmed by the Neisters' constructive fraud, as set forth herein and to be further shown at trial, in an amount to be determined.

106.    These breaches of the duties owed by the Neisters to Miracles In Sight have caused Miracles In Sight distinct harm, separate and apart from the company and the other minority members.

107.    The above-described conduct by the Neisters also justifies the imposition of punitive damages under applicable law.

Count Ten – Tortious Interference with Contract
and/or Prospective Economic Advantage

108.    The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

109.    In the alternative to Count One, the Unit Purchase Agreement and the MOU constitute valid agreements between Miracles In Sight and HEO3.

110.    The Neisters are not individually parties to the Unit Purchase Agreement and/or the MOU, but as members and managers of HEO3 and OPD, they were very much aware of the terms of those agreements, as well as the purported January 2016 license agreement between Ed Neister and OPD.

111.    The Neisters have intentionally taken actions to prevent HEO3 from being able to perform its obligations under the Unit Purchase Agreement and the MOU, in an effort to gain personal advantage and/or to impair the contractual rights and prospective economic advantage of Miracles In Sight.

112.    The Neisters acted without justification in procuring HEO3's breaches of these agreements because their motives were not reasonably related to the protection of a legitimate business interest, but rather were based on malice.  Upon information and belief, and without limitation, the Neisters acted in breach of their fiduciary duties in an effort to gain personal

advantage by inducing Miracles In Sight to invest $2 million and then preventing Miracles In Sight from receiving the benefit of its bargain.

113.    Miracles In Sight has been damaged by the Neisters' tortious actions, as set forth herein and as will be further shown at trial, in an amount to be determined.

114.    The above-described conduct by the Neisters also justifies the imposition of punitive damages under applicable law.

Count Eleven – Alter Ego / Piercing the Corporate Veil

115.    The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

116.    The Neisters were the sole members of HEO3 at the time they solicited the investments at issue in this action from Miracles In Sight, and they have been controlling members and managers of the entity at all times relevant to these claims.

117.    Upon information and belief, the Neisters, by their conduct, exercised prior to the Unit Purchase Agreement and continue to exercise complete domination and control with respect to HEO3, specifically with respect to the transactions at issue here, such that the entity had no separate mind, will, or existence of its own.

118.    Upon information and belief, for the reasons stated herein and as may be further shown at the trial of this action, the Neisters have used the corporate identity of HEO3 to promote and perpetrate fraud and injustice with respect to Miracles In Sight.

119.    Upon information and belief, the Neisters have used the corporate identity of HEO3 to promote and perpetrate fraud and injustice with respect to Miracles In Sight by, *inter alia*, misrepresenting the scope and nature of HEO3's rights with regard to the Technology, in order to induce Miracles In Sight's investment; misrepresenting the use of funds invested in

24

HEO3, in order to induce Miracles In Sight's investment; failing to observe corporate formalities; failing to follow proper accounting procedures to track and report HEO3's operations; insufficiently capitalizing HEO3; intermingling HEO3 corporate assets with the personal assets of the Neisters and/or corporate assets of other entities owned and/or controlled by the Neisters; diverting funds invested by Miracles In Sight and other corporate funds and other assets to and for their own benefit and/or the benefit of other entities or enterprises owned and/or controlled by the Neisters; and/or actively concealing from and misrepresenting to Miracles In Sight and others the true nature of HEO3's assets, operations, and financial standing.

120.    The instrumentality rule is appropriate here because, as is described in this Complaint and will be further shown at trial, the Neisters exercised their domination and control over HEO3 to commit the wrongs alleged, to perpetrate the violations of the Defendants' legal duties, and to engage in dishonest and unjust acts in contravention of Miracles In Sight's legal rights.

121.    The Neisters' control of HEO3 and breaches of duties have proximately caused Miracles In Sight injury and unjust loss.

122.    Miracles In Sight has been damaged by the Neisters' actions, as set forth herein and as will be further shown at trial, in an amount to be determined.

## DEMAND FOR JURY TRIAL

123.    Miracles In Sight hereby demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

Therefore, Miracles In Sight respectfully asks this Court to enter judgment in favor of the Plaintiff and against the Defendants as follows:

25

(i)     That the Court award Miracles In Sight all compensatory and statutory damages, in an amount to be proved at trial, caused by the wrongful conduct of the Defendants, as alleged herein, plus interest at the maximum rate allowed by law;

(ii)    That the Court order the Defendants to pay to Miracles In Sight treble and/or punitive damages as a result of the Defendants' unfair or deceptive trade practices, fraud, and other intentional misconduct, to the fullest extent allowed by law;

(iii)   That Miracles In Sight recover from the Defendants all costs of suit incurred herein, including reasonable attorneys' fees and related expenses, in the maximum amount allowed by law; and

(iv)    That Miracles In Sight be granted such other and further relief to which it may be justly entitled.

This the 19th day of June, 2019.

PARRY TYNDALL WHITE

By:     /s/ K. Alan Parry
        K. Alan Parry
        State Bar No. 31343
        The Europa Center
        100 Europa Drive, Suite 401
        Chapel Hill, NC 27517
        Phone: 919-246-4676
        Fax: 919-246-9113
        aparry@ptwfirm.com

ATTORNEYS FOR PLAINTIFF THE NORTH CAROLINA EYE BANK, INC. D/B/A MIRACLES IN SIGHT